[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-14509

_____

TRAVELERS    PROPERTY    CASUALTY    COMPANY    OF
AMERICA,

Plaintiff-Counter Defendant-Appellant,

FLYHOPCO LLC, et al.,

Plaintiffs,

*versus*

OCEAN REEF CHARTERS LLC,

Defendant-Counter Plaintiff-Appellee,

STONEGATE BANK,

2                        Opinion of the Court                    21-14509

                                                                Defendant.

                          _____

                Appeal from the United States District Court
                   for the Southern District of Florida
                      D.C. Docket No. 9:18-cv-81270-RAR

                          _____

Before NEWSOM, LUCK, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

        This is the second time this Court has considered this insur-
ance coverage dispute between Travelers Property Casualty Com-
pany of America ("Travelers") and Ocean Reef Charters LLC,
("Ocean Reef"), a Florida Limited Liability Company.  Ocean Reef
owned a 92-foot yacht, the *M/Y My Lady*, which was destroyed dur-
ing Hurricane Irma in September 2017.  Ocean Reef had a $2 mil-
lion insurance policy with Travelers covering property damage to
the yacht.  One of the *My Lady*'s representatives for Ocean Reef
with respect to the boat, Richard Gollel, moored the yacht to a
dock behind his Pompano Beach, Florida residence as the hurricane
approached.  But the yacht was destroyed by what registered as a
Category 4 storm.

        Travelers tried to avoid paying for the loss by preemptively
seeking a declaratory judgment that the policy did not cover the
loss because Ocean Reef did not have a full-time, licensed captain

and crew for the yacht during the hurricane, as required under warranties in the insurance policy.  It brought the declaratory action in the Western District of New York, alleging that Ocean Reef had an office and its principal place of business in Rochester, New York.[1] Under New York state law, an insured forfeits coverage by violating a marine insurance warranty, regardless of whether the violation had any effect on the accident.[2]  The same is true under federal admiralty law as applied to at least some marine insurance warranties.  *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 996 F.3d 1161, 1167–68 (11th Cir. 2021).

The Western District of New York granted Ocean Reef's motion to transfer the case to the Southern District of Florida under 28 U.S.C. § 1404(a).  The Court found venue proper in the Southern District of Florida because the convenience of witnesses favored Florida, New York bore little connection to the dispute, and, for the purposes of considering the motion to transfer, the

---

[1] The Travelers insurance policy for the *My Lady* stated Ocean Reef was in care of Gollel's company, Richard Gollel & Co., Inc., which has a Rochester, New York address.

[2] *See Com. Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 31–32 (2d Cir. 1999) (discussing how, "[u]nder . . . the law of most states," including New York, "warranties in maritime insurance contracts must be strictly complied with, even if they are collateral to the primary risk that is the subject of the contract, if the insured is to recover" (citing N.Y. Ins. L. § 3106(c))).  "However, unlike New York and the majority of states, Florida does not require strict compliance with all warranties, but it does preclude recovery where the 'breach or violation increased the hazard by any means within the control of the insured.'"  *Id.* at 32 (quoting Fla. Stat. § 627.409(2)).

choice-of-law analysis favored applying Florida law rather than New York law. After the transfer, Ocean Reef—relying on Florida law—counterclaimed for damages on the theory that Travelers breached the insurance contract by refusing to cover the loss. It claimed it had a right to recover the policy maximum, as no deductible applied because the accident was a total loss of the yacht. Ocean Reef also sought declaratory judgments that the warranties did not preclude coverage. Under Florida law, an insured remains covered for an accident despite violating a policy warranty, unless the violation "increased the hazard by any means within the control of the insured." Fla. Stat. § 627.409(2).

On cross-motions for summary judgment, the District Court granted summary judgment for Travelers, agreeing with it that federal law applied, and that Ocean Reef therefore forfeited its insurance coverage. On appeal, we reversed, holding that under *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 75 S. Ct. 368 (1955), Florida law applied because we did not find that any "entrenched federal maritime rules governing captain or crew warranties" existed. *Travelers*, 996 F.3d at 1169, 1171. That meant Travelers would have to prove on remand that the failure to retain a full-time captain "play[ed] [a] part in the loss" under Florida's anti-technical statute.[3] *Id.* at 1170 (quoting parenthetically *Pickett v. Woods,* 404 So. 2d 1152, 1153 (Fla. 5th Dist. Ct. App. 1981)).

---

[3] Florida Statute § 627.409(2) is a "so-called 'anti-technical statute.'" *Travelers*, 996 F.3d at 1164. The statute "was 'designed to prevent the insurer from

On remand, because Travelers offered no expert witness— such as a licensed captain competent to speak to the issue—to prove that the lack of a full-time captain and crew played a role in the destruction of the yacht during Irma, the District Court granted summary judgment to Ocean Reef.  We affirm.

## I.

### A.

Ocean Reef first obtained insurance from Travelers for the *My Lady* in 2014.  Coverage under that plan ran from October 10, 2014, through October 10, 2015.  Ocean Reef renewed its policy for two more terms, so that in September 2017, it was covered by a policy running from October 10, 2016, through October 10, 2017.  The policy covered Ocean Reef for up to $2,000,000 of property damage.

Ocean Reef's insurance policy had contained two express warranties since Ocean Reef first insured the *My Lady* with Travelers in 2014.  One was called the "Captain Warranty."  The Captain Warranty provides:

> It is warranted you employ a professional captain for the yacht shown on the Declarations Page of this policy.  Such captain shall be employed full time and approved by us.  We will pay up to $1,500 for the cost of hiring a replacement captain, approved by us, if

---

avoiding coverage on a technical omission playing no part in the loss.'"  *Id.* at 1170 (quoting parenthetically *Pickett v. Woods,* 404 So. 2d 1152, 1153 (Fla. 5th Dist. Ct. App. 1981)).

your captain is unable to perform his regular duties
due to a medically certified cause.

The other warranty was called the "Crew Warranty." The
Crew Warranty provides:

> You employ 1 full time or part time professional crew
> for your yacht shown on the Declarations Page of this
> policy. We also provide coverage for any additional,
> temporary crew you employ.

Travelers initially issued the insurance policy with the Cap-
tain and Crew Warranties only after Ocean Reef amended its ap-
plication to represent that it would employ Jason Gabriel—a pro-
fessional, licensed captain—as the full-time captain. Gabriel re-
signed later that year. Ocean Reef then hired Captain Michael
McCall—another licensed, professional captain—in January 2015.
Captain McCall accompanied Gollel and his family on a two-week
trip to the Bahamas shortly after he began his duties. He remained
captain of the *My Lady* until April 2015, though he noted in his dep-
osition that he did not consider the role a "full-time assignment"
after the Bahamas trip.

The parties generally dispute the extent to which Ocean
Reef complied with the Captain and Crew Warranties between
April 2015 and September 2017; they also dispute Travelers' will-
ingness to pay out claims in prior cases when Ocean Reef was non-
compliant. Travelers paid a claim for damages to the yacht caused
by a lightning strike in 2016, though it now claims it only "hon-
ored" the claim "after Ocean Reef provided proof that it had a pro-

fessional, full-time licensed captain[,] albeit one not previously submitted to Travelers for approval." The captain when lightning struck the boat was Captain Daniel Tam. Ocean Reef claims that, in paying out this claim, "Travelers did not rely on the retroactive approval alone, and it was irrelevant," because Travelers' internal documents discussing the claim provided that Travelers also "determined that the 'capt[ain] was not material to this loss.'" (quoting a note by the Travelers adjuster assigned to review the claim). Ocean Reef says this note meant Travelers covered the loss because it knew "Florida's anti-technical statute" applied.

On the other hand, Travelers denied a claim for the loss of a jet ski that was stolen from the yacht in June 2017 while the *My Lady* was in the Bahamas. Travelers denied coverage "because the Vessel did not have a professional, licensed captain approved by Travelers at the time of the theft." Ocean Reef does not dispute the facts surrounding the denial of coverage for the theft of the jet ski. By August 2017, a Travelers underwriter had emailed management recommending that the company not renew Ocean Reef's coverage—which would expire on October 10, 2017—due to a "very shady" claims history.[4] Travelers then sent Ocean Reef a "notice of nonrenewal of insurance" dated August 14, 2017.

---

[4] The email read: "Per discussions with Tom & Joe, I was told we should look to non-renew this account due to a very shady 2016 claim. I was told [that] the PWC theft is also suspect and when the first claim happened the Capt. said he was not full time and then he was, according to Joe, it just seems very shady." The email also noted the yacht had "a 655% loss ratio" due to the claims described above.

Hurricane Irma approached Florida in early September 2017. On September 4, Gollel contacted Captain McCall—the former captain—to see if he could retake the helm as "temporary captain" of the *My Lady* during the storm. McCall said he was in Provincetown, Massachusetts, but would track the storm forecasts and fly down to move the yacht if appropriate.

The following afternoon, McCall called Gollel back.[5] McCall testified at his deposition that he "told him that after looking at the latest forecast, that [he] didn't see a safe place to take the boat." The hurricane forecast had changed, and it was projected "to go close to south Florida and then turn and go straight up the east coast." Gollel "agreed and told [McCall] that he had called a marina close by and he was waiting to hear back from them."

On September 6, Gollel then had his insurance agent reach out to Travelers' agent to request Travelers' permission to move his yacht, even though, per the email, Gollel was "in between captains." The email said Gollel was "requesting to be able to move the vessel himself, to a safe harbor in the vicinity, for the approaching Hurricane Irma." The email said Gollel "has been boating his whole life" and ultimately wanted advice on whether he should instead "leave it where it is & just secure it with additional lines, bumpers, etc."

---

[5] McCall testified in his deposition that he made the last phone call regarding temporary service as captain three days after the first call, but that he had no reason to dispute his phone records showing a call the following day.

Travelers' agent responded that evening by emailing Gol-lel's agent that she had "not yet heard back from [T]ravelers" about Gollel moving the boat himself and "would say to not move the boat until we have confirmation from the carrier. The insured is already in breach of warranty by not having a full-time captain so we don't want to chance it." Travelers' agent then reached back out on the morning of September 7 to inform Gollel's agent that Travelers had "requested an updated hurricane plan as this will need to go to home office for approval prior to anyone other than the [full-time] captain operating the boat."

Later that morning, Gollel's agent responded to Travelers' agent. She said: "[T]he insured is leaving the vessel docked where it is usually docked in lieu of moving it to inside the [Intracoastal waterway] where he feels it will be safer & suffer less damage." She then asked if there was "any way" the agent could get Travelers' underwriting department "on the phone quickly to see if they would prefer he move the vessel." Early that afternoon, Travelers' agent relayed the following from the insurer: "Given the impend-ing weather threat and short notice given by the insured, the policy cannot be changed." Gollel explained in his deposition that he thought the nearby Intracoastal waterway would be a "more pro-tected" place during the storm—presumably meaning "more pro-tected" from waves and wind.

Gollel ended up securing the yacht to the dock behind his residence before the hurricane struck. His two sons assisted. Gol-lel testified at his deposition that they "tied the boat up with extra

ropes," positioned "extreme commercial bumpers between the boat and the dock," and "disconnected the anchor and chained the boat to a secure tree." They also secured loose items. They tied the yacht to ten concrete pilings that "ran perpendicular to the dock," and then to two "dolphin pilings" that were adjacent to the dock.

Hurricane Irma struck between September 10 and 11. During the storm, the *My Lady* sank. The parties describe the sinking's cause differently but generally agree that a mooring pile came loose, the boat hit Gollel's cement sea wall—which caused the hull to break—and it sank. The boat sustained enough damage to amount to a "total loss" under Ocean Reef's policy.

*B.*

Within a day after the hurricane, Ocean Reef submitted a claim for coverage of the loss of the *My Lady* and requested that Travelers front the money for raising the yacht out of the water. Travelers considered this request, and then informed Gollel on September 21 that it would front the money for raising the vessel but would still investigate whether it would cover the loss. Travelers then sent Ocean Reef a "reservation of rights" letter dated September 25, 2017, informing Ocean Reef that it reserved the right to deny coverage and to seek reimbursement for fronting the cost of raising the yacht out of the water.

On September 26, Travelers filed for a declaratory judgment in the Western District of New York—where it claimed Ocean Reef's principal place of business was located. The action sought a

declaration that Ocean Reef failed to comply with the Captain and Crew Warranties, and that the *My Lady*'s sinking was therefore not covered.

On November 9, 2017, Travelers sent Gollel a letter indicating it would continue to front the money to finish raising and securing the vessel, but that it declined coverage for his claim because he failed to comply with the Captain Warranty and Crew Warranty. The letter also noted that Travelers had filed for a declaratory judgment in the Western District of New York "in support of th[e] Declination."

\*     \*     \*

As indicated *supra*, Travelers likely engaged in a strategy to avoid the application of Florida's anti-technical statute, Fla. Stat. § 627.409(2). Under that statute, it would need to prove that the lack of a full-time captain and crew played a material role in the *My Lady*'s sinking to avoid paying Ocean Reef. On the other hand, under the federal rule that applies to some marine insurance warranties, *Travelers*, 996 F.3d at 1167–68, "and the law of most states," including New York, "warranties in maritime insurance contracts must be strictly complied with, even if they are collateral to the primary risk that is the subject of the contract, if the insured is to recover." *Com. Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 31–32 (2d Cir. 1999) (citing N.Y. Ins. L. § 3106(c)). When the Western District of New York granted Ocean Reef's motion to transfer the case to the Southern District of Florida, it found—for

the purposes of that order—that "the choice-of-laws analysis disfavors New York and favors the State of Florida, which appears to have more relevant contacts." Travelers had to know that Florida law may apply, even if *Wilburn Boat*'s framework causes "confusion" as to which marine insurance warranties fall under federal rules requiring strict compliance. *See Travelers*, 996 F.3d at 1167–68. The following reviews the evidence each side gathered about the accident.

\*     \*     \*

In October 2017, Gollel spoke with Captain McCall. McCall then emailed Gollel and Lisa Steinhoff, a manager at Ocean Reef. The email explained McCall's arrangement with Gollel as Irma approached:

> I Captain Mike McCall was hired by Mr. Gollel on September 5 thru September 15 2017 as temporary Captain. At that time I was on another boat in New England but was going to make arrangements to fly down. Due to uncertainty of where to move the boat, Hurricane forecast, and miscommunications with Mr. Gollel I never made the arrangements and therefore [was] not present at the time.

Ocean Reef never compensated Captain McCall for this temporary captain assignment.

Neither party disclosed Captain McCall as an expert witness. So, at trial, he could only testify based on his "personal knowledge." Fed. R. Evid. 602. Any opinions he might give would need to be "rationally based on" his first-hand observations and

"not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(a), (c).

When Travelers deposed Captain McCall, it asked him about his prior experience preparing various boats for hurricanes as their captain. It also asked, in various ways, whether it is "generally" better to move a boat out of the path of a hurricane. The following exchange illustrates:

> **Travelers' Counsel**: Would you leave a vessel like the *My Lady* tied up to a concrete bulkhead during the storm that was anticipated?
>
> **McCall**: If that was the only option, yes.
>
> **Travelers' Counsel**: If there was—would there be an[y] preferable options that you can think of to leaving a vessel tied to a concrete bulkhead in the conditions that you were anticipating?
>
> **McCall**: Yes. To move the vessel.
>
> **Travelers' Counsel**: What sort of locations would you consider to be a better option?
>
> [intervening objection to form]
>
> **McCall**: A long ways away from where the storm was projecting to hit.

McCall also noted that whether the Ocean Reef Marina would be "an appropriate place to leave the *My Lady* during hurricane conditions" would "depend[] on the conditions" and the particular circumstances of the storm.

McCall then clarified on cross-examination by Ocean Reef's counsel that using straps and ropes to secure a boat would be "typical" when moving a boat out of a storm's path was not a viable option. He also said that he did not "see a good option . . . for moving [the *My Lady*] to avoid the storm entirely" because the storm was forecasted to move up the East Coast, where he had previously considered moving it.

Travelers did not disclose an expert witness for its case-in-chief to discuss what a captain would have done with the *My Lady* during Irma. On January 28, 2019, however, Travelers disclosed a rebuttal expert, Captain Joseph Ahlstrom, notifying Travelers that "Captain Ahlstrom may be called to rebut any testimony that Ocean Reef Charters LLC had a full-time, professional captain at any relevant time." It made this disclosure assuming a federal strict-compliance rule applied.

On February 25, 2019, Ocean Reef disclosed Captain Thomas Danti and Allister Dredge, a marine surveyor, as expert witnesses. They attached both experts' reports to the disclosure. The disclosure included both experts' qualifications, their opinions, and the bases for their opinions. *See* Fed. R. Civ. P. 26(a)(2). Captain Danti opined, after interviewing Gollel and inspecting the site, that the "storm preparations by Mr. Gollel met the standard of care of a professional Mariner." He also opined that "[t]he main cause of the vessel's damage was unforeseeable failure of a mooring pile." So, "[t]he lack of a full time captain would not have prevented the

yacht [from] becoming a total loss." Danti's bottom-line conclusion was: "There was no increase[d] hazard in risk to the vessel by not having a full time captain at the time of the incident." Dredge, the surveyor, also opined that the damage to the yacht was a "constructive total loss," as repairs would cost $2.5 million.

Captain Danti fleshed out his opinion when Travelers' counsel deposed him. Danti answered various questions about moving boats away from hurricanes. The upshot of his answers was that there is "no magical formula" to preparing for a hurricane "except to try to do the best you can to protect your vessel in a particular location. So you have to take that into consideration, the size of the vessel, where it's located, how congested it is in the area," along with the weather conditions and how the vessel could be secured.

Captain Danti also discussed how finding an available place for a boat as a hurricane approaches can be challenging. He noted that, "if you go down any of the canals in Florida today, you'll see that they're all developed, that the ability to even put a boat in the mangroves has gone away because of development." As to the Intracoastal waterway, it "is very congested today, loaded with private docks and private yachts and is very limited as far as any locations that may be applicable for use that I know of." And as to whether hauling a boat out of the water is better than securing it in the water, he explained that "[t]he vessels that were damaged during Hurricane Irma in the islands, a lot of those boats were hauled out of the water and then once the storm came through, it was like a domino effect."

Travelers had thirty days from Ocean Reef's submission of Captain Danti's report on February 25, 2019, to disclose expert "evidence [that was] intended solely to contradict or rebut evidence on the same subject matter." Fed. R. Civ. P. 26(a)(2)(D)(ii). Thirty days from then was March 27, 2019. In a letter postmarked on April 1, 2019, Travelers mailed Ocean Reef a report—with March 29, 2019, as the date in the header—by Captain Ahlstrom purporting to rebut Captain Danti's opinions. In it, Ahlstrom opined, "Any competent captain would have recognized that the *My Lady* was in a perilous position moored behind Mr. Gollel's house at Hillsboro Inlet and needed to be relocated to a more sheltered location." He also opined that, "[d]uring the hurricane, the vessel pushed on pilings and the cement seawall[,] exactly the risk a competent captain would have recognized and sought to avoid by moving the vessel."

\*      \*      \*

After we remanded the case for consideration under Fla. Stat. § 627.409(2), the parties held an unreported status conference on June 8, 2021. The District Court did not reopen discovery, and neither party claims it requested that the Court do so. Ocean Reef then renewed its motion for summary judgment and renewed a motion it had filed along with its first motion for summary judgment.[6] In the latter motion, Ocean Reef moved to either (1) strike Captain Ahlstrom's rebuttal report as untimely and beyond the initial disclosure—that he would rebut evidence offered to show

---

[6] Ocean Reef also argued in its renewed motion for summary judgment that Travelers could not meet its burden with a rebuttal expert.

Ocean Reef had employed a full-time captain; or (2) preclude Travelers from calling Captain Ahlstrom to testify in its case-in-chief, and thereby exclude the report from consideration for summary judgment purposes.

Travelers responded to Ocean Reef's motion on Ahlstrom's report by making two arguments pertinent to this appeal. One was titled, "Travelers Timely Disclosed Captain Ahlstrom as its Expert, and any Delay in Producing Captain Ahlstrom's Rebuttal Report was Harmless" under Federal Rule of Civil Procedure Rule 37. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). It argued that even if it sent Ocean Reef the report too late, the delay was "hardly time for any prejudice to Ocean Reef." Travelers "alternatively pray[ed] for a brief extension of the expert disclosure deadline to bring its service of Captain Ahlstrom's report into compliance with Rule 26(a)(2)(D)(ii)," which provides the 30-day deadline for disclosure of expert rebuttal evidence. The second argument was titled, "Captain Ahlstrom's Report is Proper Rebuttal Testimony," meaning "Ocean Reef's Motion" to strike the report "should be denied because Captain Ahlstrom's report squarely rebuts Mr. Danti's opinions."

The District Court granted Ocean Reef's motion to exclude Ahlstrom from testifying in Travelers' case-in-chief and then

granted summary judgment for Ocean Reef because Travelers lacked competent evidence to prove its case under Florida law. The District Court held that Ocean Reef was "entitled to $2 million—the full coverage amount of the Vessel . . . in case of complete loss." As to Ahlstrom's report, the Court only reached the issue of whether to exclude Ahlstrom from testifying in Travelers' case-in-chief but did not strike the report as untimely and implicitly assumed that it was proper rebuttal evidence, even if it went beyond the scope of Travelers' initial, January 2019 disclosure. This appeal followed.

## II.

We review the District Court's grant of summary judgment *de novo*. *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party can show there is no genuine dispute of material fact by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

Travelers bore the burden of proof under Florida law. *See infra*, Part II.A. In moving for summary judgment, Ocean Reef bore "the initial responsibility of informing the district court of the basis for its motion," and then Rule 56 "mandate[d] the entry of summary judgment, after adequate time for discovery and upon

motion, against" Travelers if it "fail[ed] to make a showing suffi-cient to establish the existence of an element essential to [its] case, and on which [it would] bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552–53 (1986). "'In such a situation, there [could] be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily ren-ders all other facts immaterial.'" *Grange Mut. Cas. Co. v. Slaughter*, 958 F.3d 1050, 1057 (11th Cir. 2020) (quoting *Celotex*, 477 U.S. at 322–23, 106 S. Ct. at 2552). For the reasons discussed in *Travelers Property Casualty Co. of America v. Ocean Reef Charters LLC*, 996 F.3d 1161 (11th Cir. 2021), Florida law applies.

This case boils down to two issues. One is whether, under Florida's anti-technical statute, the insurance company must prove that the breach of the Captain Warranty "contribute[d] to" the *spe-cific* accident. *Pickett*, 404 So. 2d at 1153. Travelers claims that all it must show is that the lack of a full-time captain *generally* makes vessels more susceptible to damage from hurricanes. Under Trav-elers' theory, Florida law does not require it to prove that Ocean Reef's noncompliance with the Captain Warranty actually caused *this* accident to any extent.

The second, related issue is whether, in meeting its burden of proof under Florida law, Travelers needed to introduce expert testimony in its case-in-chief about what would have been different if Ocean Reef had complied with the applicable warranties. Trav-

elers argues it could show that the lack of a full-time captain increased the hazard to the *My Lady* during Hurricane Irma without an expert witness in its case-in-chief. Instead, it claims it could meet its burden with lay testimony by Gollel that he wanted to move the *My Lady* as Hurricane Irma approached, and so-called "hybrid fact-expert witness testimony" by Captain McCall. Appellant's Br. at 23. Travelers also claims, "the District Court's decision to grant Ocean Reef's [motion] to the [sic] limit the testimony of Travelers' expert (Captain Ahlstrom) solely to rebuttal and, in turn, employ the general rule that the testimony of a rebuttal expert cannot be used to avoid summary judgment was an abuse of discretion." Appellant's Br. at 37.

Travelers is wrong on all counts. We address each issue in turn.

### A.

The Florida anti-technical statute we must apply provides:

> A breach or violation by the insured of a warranty, condition, or provision of a wet marine or transportation insurance policy, contract of insurance, endorsement, or application does not void the policy or contract, or constitute a defense to a loss thereon, unless such breach or violation increased the hazard by any means within the control of the insured.

Fla. Stat. § 627.409(2). "The statute is designed to prevent the insurer from avoiding coverage on a technical omission playing no part in the loss." *Pickett*, 404 So. 2d at 1153. Whether an insured

increased the hazard by noncompliance with a warranty "is typically a question of fact for the jury." *Serendipity at Sea, LLC v. Underwriters at Lloyd's of London Subscribing to Pol'y No. 187581*, 56 F.4th 1280, 1290 (11th Cir. 2023) (citing *Pearl Assurance Co. v. S. Wood Prods. Co.*, 216 F.2d 135, 136 (5th Cir. 1954)).[7]

The Florida District Court of Appeal discussed the significance of the state's anti-technical statute in *Pickett*. There, an insurance company tried to avoid covering a claim for a death in a plane crash.[8] *Pickett*, 404 So. 2d at 1152–53. The insurer claimed that the loss was not covered because the policy did not apply to an insured "who operates or permits the operation of the aircraft, while in flight, unless its airworthiness certificate is in full force and effect." *Id.* at 1152. After the jury found, on a special verdict form, that the plane lacked a valid airworthiness certificate during the accident, the trial court entered judgment for the insurance company. *Id.*

The Florida District Court of Appeal reversed and remanded. The court explained that, "[f]rom the facts as stated" by the insured, "the crash was due to pilot error," as "the plane flew

---

[7] Decisions of the former Fifth Circuit issued before October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[8] The decedent had originally planned "to return [home] by commercial airline to Daytona Beach from a golfing trip in North Carolina." Tracie S. Boone, Case Note, Pickett v. Woods*, 404 So. 2d 1152 (Fla. 5th DCA 1981)*, 10 FLA. ST. U. L. REV. 737, 741 (1983) (citing Appellant's Initial Br. at 5, *Pickett*, 404 So. 1152 (No. 80-1112)). He changed his mind and "accepted a ride home in a friend's Cessna 310," a propeller plane, "and played nine more holes of golf." *Id.*

into the ground while attempting to land in bad weather." *Id.* at 1153. The crash was not, however, "the result of any malfunction," so "the failure to have a valid airworthiness certificate did not contribute to the accident." *Id.* The court held that the anti-technical statute "should apply and prevent the insurance company from relying on the exclusion to deny coverage" if the trial court found on remand that the breach did not increase the hazard to the plane. *Id.* The court emphasized that if the insurer's "interpretation" of the anti-technical statute "were accepted, it would actually be to the insurer's advantage that the insured failed to renew the airworthiness certificate. In such event, the insurer would collect a premium but would have no exposure to risk because the policy would no longer be effective." *Id.*

We recently applied Florida's anti-technical statute in a case involving the destruction of a yacht during Hurricane Dorian. *See Serendipity at Sea,* 56 F.4th at 1282. There, the insurer, not the insured, hired Captain Danti as an expert witness. *Id.* The insurer claimed Captain Danti offered "undisputed testimony" that the insured's failure to "employ a full-time licensed captain in violation of the policy's Captain Warranty" increased the hazard to the yacht. *Id.* In essence, he opined that a full-time captain would have moved the boat away from the Bahamas—where the yacht was moored, and where the hurricane hit head on—and back to Cape Canaveral, the yacht's primary mooring location. *Id.* at 1287. The District Court found Captain Danti's opinion on the matter undisputed because the insured did not offer an opposing expert and granted summary judgment to the insurer. *Id.*

We reversed the District Court because we found Captain Danti's expert opinion relied on facts about which there was reasonable dispute. *See id.* at 1288. Specifically, we explained that the insured cited weather reports in its motion for summary judgment that showed Hurricane Dorian was unpredictable, and that as of the day before the storm hit the Bahamas—where the yacht was moored—it was projected to hit Cape Canaveral, not the Bahamas. *Id.* at 1283, 1289. That undermined Captain Danti's opinion that a full-time captain would have moved the yacht from the Bahamas to Cape Canaveral. *See id.* at 1287–89. So, there was a genuine factual issue for the jury as to whether the lack of a full-time captain increased the hazard to the yacht. *Id.* at 1290–91.

The rule from these cases is clear: to meet its burden under Florida's anti-technical statute, the insured must show that, under the circumstances of the specific accident at issue, the breach of the warranty had some material effect on the loss. Otherwise, the insurer could "avoid[] coverage on a technical omission playing no part in the loss." *Pickett*, 404 So. 2d at 1153.

*B.*

The next question is whether Travelers has admissible evidence that raises a genuine issue of material fact about whether the lack of a full-time captain or crew played a material role in causing the *My Lady*'s sinking. Because Travelers did not disclose an expert to testify in its case-in-chief, it lacks evidence from which a jury could reasonably find in its favor.

The effect of Ocean Reef's failure to retain a full-time captain and crew leading up to and during Hurricane Irma is exactly the kind of issue that requires expert testimony. The question is hypothetical. Discussing what *would have* happened if a captain *were* in charge of the *My Lady* during Hurricane Irma necessarily requires hypothesizing. "And the ability to answer hypothetical questions is '[t]he essential difference' between expert and lay witnesses." *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) (citation omitted) (alteration in original).

As Rule 701 provides, a lay witness could not competently offer an opinion on what a captain would have done with the *My Lady* if one were in charge. Federal Rule of Evidence 701, Opinion Testimony by Lay Witnesses, states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> > (a) rationally based on the witness's perception;
> >
> > (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> >
> > (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

So, a lay witness can only speak to what he in fact observed. Rule 701 permits opinions, but only those "rationally based on the

witness's perception" that help clarify the lay witness's actual ob-
servations, and which do not rely "on scientific, technical, or other
specialized knowledge." *Id.* A lay witness cannot offer a hypothe-
sis about what caused the *My Lady* to sink or what professional cap-
tains or crews might have done to change the outcome. Indeed,
the question here is what *experts* would have done differently to
avoid the accident.

Travelers' attempts to avoid this fundamental problem with
its case-in-chief do not work. There is no such thing as "hybrid fact-
expert witness testimony" in the sense that Travelers claims. Ap-
pellant's Br. at 23. Of course, a properly disclosed and qualified
expert can testify as both an expert and a fact witness. But the Ad-
visory Committee's note to the 2000 amendment to Rule 701—the
amendment that added Rule 701(c)—explicitly says that the
amendment was designed to "eliminate the risk that the reliability
requirements set forth in Rule 702 will be evaded through the sim-
ple expedient of proffering an expert in lay witness clothing." Fed.
R. Evid. 701 advisory committee's note to 2000 amendment. And
so, "[b]y channeling testimony that is actually expert testimony to
Rule 702, the amendment also ensures that a party will not evade
the expert witness disclosure requirements set forth in Fed. R. Civ.
P. 26 and Fed. R. Crim. P. 16 by simply calling an expert witness in
the guise of a layperson." *Id.*

True, a lay witness who has a job requiring expertise may
acquire first-hand, "particularized knowledge" of probative facts

while performing her duties. *Id.* For example, a physician's observation of a patient's injury during treatment is permissible lay testimony (assuming it is otherwise admissible). *See Henderson*, 409 F.3d at 1300. But a hypothesis about causation is outside a lay witness's competency, even if the lay witness happens to have the expertise to draw such conclusions.[9] *See id.*; *see also* 4 *Weinstein's Federal Evidence* § 701.03[1] (2023) ("Regardless of the degree to which

---

[9] There is some gray area between lay and expert testimony when the lay witness has expertise and used that expertise to make first-hand observations. For example, in *Henderson*, we noted that a treating physician's "diagnosis of the injury itself, that [the victim's] jaw was fractured, would be permissible lay testimony." 409 F.3d at 1300. But we have not held that any treating physician can testify as a lay witness about any diagnosis she made while treating the patient. The plain language of Federal Rule of Evidence 701(c) prohibits lay opinions "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. A diagnosis requiring more complex diagnostic reasoning than that required to notice a broken jaw may fall under Rule 701(c)'s prohibition. *See* Stephen A. Saltzburg et al., *3 Federal Rules of Evidence Manual* § 701.02[7] (Matthew Bender 12th ed.) ("When the [treating] physician testifies that the plaintiff was coughing and running a fever, this is lay witness testimony governed by Rule 701. However, if the physician also testifies that he diagnosed the patient as having Reactive Airways Dysfunction Syndrome caused by exposure to a toxic chemical, then this is testimony based on scientific, technical, or other specialized knowledge and must be qualified under Rule 702.") (citing *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317–18 (11th Cir. 2011)). We also note that the Tenth Circuit cases we cited for the so-called "treating physician" doctrine, under which "[a] treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party," *Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999), both predated the 2000

21-14509                Opinion of the Court                27

a witness's lay opinion is based on specialized knowledge, it seems clear that the witness's personal perception will remain a fundamental prerequisite to admissibility.").

Accordingly, Captain McCall—whom Travelers did not disclose as an expert witness—could not provide his opinion on what would have happened to the *My Lady* if a licensed, professional captain were employed full-time. He could discuss the weather forecasts he observed and relate what Gollel asked of him. But those facts would leave the jury to speculate about what a captain would have done differently to avoid the storm under the specific circumstances of this case.

---

amendment to Rule 701. The other case was *Weese v. Schukman*, 98 F.3d 542 (10th Cir. 1996).

In *Williams v. Mast Biosurgery USA*, we summarized "our discussion" of the treating physician doctrine in *Henderson* as follows: "[W]hen a treating physician's testimony is based on a hypothesis, not the experience of treating the patient, it crosses the line from lay to expert testimony, and it must comply with the requirements of Rule 702." 644 F.3d at 1317–18. We also emphasized that "[t]he testimony of treating physicians presents special evidentiary problems that require great care and circumspection by the trial court," *id.* at 1316, and "that trial courts [must] be vigilant in ensuring that the reliability requirements set forth in Rule 702" are not "'evaded through the simple expedient of proffering an expert in lay witness clothing.'" *Id.* at 1317 (quoting *Henderson*, 409 F.3d at 1300 (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment)).

Here, the issue is what *would have* happened *if* the *My Lady* had a captain, a hypothetical that McCall cannot speak to as a lay witness. In an appropriate case, we should clarify when a lay witness goes too far in discussing observations that he made using his expertise.

Nor does evidence of Gollel's subjective desire to move the *My Lady* before the hurricane change the equation. Gollel, who is not a professional captain, thought his yacht might have been safer somewhere else. But where the yacht would have actually been safer was not within the competence of a nervous boat-owner as the storm approached.

Finally, Travelers cannot rely on potential testimony from Captain Ahlstrom to avoid summary judgment because it only disclosed him as a rebuttal expert. If the case went to trial, Travelers would first present its case-in-chief as plaintiff. It would need to prove that the lack of a captain had some material effect on the *My Lady*'s demise. It would not have an expert to present in its case-in-chief. After it rested, Ocean Reef would move for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The District Court would grant the motion because "a reasonable jury would not have a legally sufficient evidentiary basis to find for" Travelers. Fed. R. Civ. P. 50(a)(1). We can therefore grant summary judgment for Ocean Reef because Travelers does not have a legally sufficient case to present.

## III.

Travelers' remaining argument is that the District Court abused its discretion in refusing to consider Captain Ahlstrom's report for summary judgment purposes. Specifically, Travelers argues that it was "effectively seeking to use a rebuttal expert as a primary expert, [which] was akin to a motion to add or substitute an expert." Appellant's Br. at 39. Travelers emphasizes that after

remand, the burden of proof flipped in that it had to prove the lack of a full-time captain played a role in the accident. So, Travelers claims the District Court "should have employed its discretion to allow Travelers a modicum of flexibility to adjust to that change (at the time Ocean Reef filed and Travelers responded to Ocean Reef's Motion to Strike Captain Ahlstrom) by allowing Travelers some flexibility with regard to Captain Ahlstrom's use as an expert." *Id.* at 38. Travelers claims there was "'good cause' to re-designate or effectively substitute Captain Ahlstrom as Travelers' primary expert in this case." *Id.* at 38–39 (quoting Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.")).

When reviewing the District Court for abuse of discretion, we must affirm unless the District Court made a legal error—such as "appl[ying] an incorrect legal standard" or "follow[ing] improper procedures in making a determination"—or made "clearly erroneous" factual findings. *Equal Emp. Opportunity Comm'n v. Eberspaecher N. Am. Inc.*, 67 F.4th 1124, 1130 (11th Cir. 2023) (internal quotation marks and citation omitted). The District Court did not consider a motion to redesignate Captain Ahlstrom as an expert for Travelers' case-in-chief because Travelers did not file one. In its response to Ocean Reef's motion to exclude Captain Ahlstrom's report, Travelers asked the District Court not to strike Ahlstrom's rebuttal report as untimely. And it argued that his report rebutted Captain Danti's opinions as if it did not have the burden of proof or did not need an expert to meet that burden. The District Court did not strike the report. But Travelers did not move the Court to

redesignate Ahlstrom as a case-in-chief expert. And the District Court correctly applied Rule 56 by refusing to consider rebuttal evidence as evidence that could meet Travelers' burden of proof. We will not reverse the District Court for failing to *sua sponte* rescue Travelers' case.

## IV.

All told, without expert testimony about what a professional captain would have done differently to avoid harm to the *My Lady* during Hurricane Irma, the jury would have had to speculate to find for Travelers under Florida's anti-technical statute. And we see no need to give Travelers another bite at the apple. The District Court's grant of summary judgment is

**AFFIRMED.**